**Darryl W. SISS, Plaintiff,**

v.

**COUNTY OF PASSAIC; Passaic County Board of Freeholders; Peter Eagler, Individually and in his capacity as Freeholder; James Gallagher, Individually and in his capacity as Freeholder; Georgia Scott, Individually and in her capacity as Freeholder; Lois Cuccinello, Individually and in his capacity as Freeholder; and 10 John and/or Jane Does, as yet unknown, Defendants.**

**No. Civ.A. 98–2500 JWB.**

United States District Court,
D. New Jersey.

May 19, 1999.

Segreto & Segreto by James V. Segreto, Haledon, New Jersey, for plaintiff.

Gerber & Samson by Mary Pat Gallagher, Wayne, New Jersey, for defendants.

OPINION

BISSELL, District Judge.

This matter comes before the Court on a motion for summary judgment by all defendants: County of Passaic, Passaic County Board of Freeholders ("the Board of Freeholders" or "the Board"), Peter Eagler, James Gallagher, Georgia Scott and Lois Cuccinello. Plaintiff Darryl W. Siss filed the Complaint ("Compl.") in this action on April 27, 1998 in the Superior Court, Law Division, Passaic County. On May 29, 1998, defendants removed the action to this Court.

Plaintiff claims in this action that defendants terminated him from his position as Assistant County Counsel in violation of various state and federal rights. Count II of plaintiff's Complaint alleges that defendants discharged him in contravention of the New Jersey Open Public Meetings Act, N.J.S.A. 10:4–1 *et seq.* (Count II). Count I is predicated on numerous theories of recovery. It alleges that defendants "were required as a matter of law and due process ... to serve him with charges and provide a hearing none of which occurred." (Compl., ¶ 4). In addition, it alleges that defendants' termination of plaintiff because he is a Republican "constitutes an impermissible infringement upon his Federal First Amendment as well as State Constitutional Rights and Common Law rights to be free of retaliatory termination of his public employment by reason of his political affiliations." (*Id.,* ¶ 5). Count I further alleges: "The action of Defendants in addition to being a violation of the Federal and State constitution is a violation of the Federal Civil Rights Act as well as the Laws against discrimination of the State of New Jersey." (*Id.,* ¶ 11). Finally, Count I alleges: "The Plaintiff's right to associate with others for the advancement of his political beliefs and ideas is a form of constitutionally protected activity under the First and Fourteenth Amendments of the Constitution of the United States and the Constitution of the State of New Jersey." (*Id.,* ¶ 18).

Thus, plaintiff's Complaint apparently asserts claims for: violations of New Jersey's Open Public Meetings Act; violations of due process, presumably under the fourteenth amendment to the United States Constitution; infringement of plaintiff's rights of freedom of speech and association under the first and fourteenth amendments to the United States Constitution and under an unidentified provision of the New Jersey Constitution, presumably article I, paragraph 5; unlawful retaliation in violation of the "Federal Civil Rights Act," 42 U.S.C. § 1983, and the "Laws against discrimination of the State of New Jersey," N.J.S.A. 10:5–1 *et seq.* (*id.,* ¶ 11); and finally, violation of his "Common Law right to be free of retaliatory termination," (*id.,* ¶ 5).[1]

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

### FACTS AND BACKGROUND

This action arises out of the Passaic County Board of Freeholders' termination of plaintiff as Assistant County Counsel after an election transferred control of the Board of Freeholders to a Democratic majority. Individual defendants Eagler, Gallagher, Scott and Cuccinello are the Democrats on the seven-member Board of Freeholders. They voted to discharge plaintiff over the opposition of the three Republican Freeholders.

Plaintiff asserts many loosely articulated claims, as discussed above. Defendants seek summary judgment as to the entire Complaint. Defendants deny that they violated the Open Public Meetings Act, the New Jersey Law Against Discrimination ("NJLAD"), and the New Jersey Constitution. Although they deny terminating plaintiff because of his party affiliation, they argue for purposes of this motion that doing so would not have violated his federal first and fourteenth amendment rights to freedom of speech and association.

With respect to those claims, they argue, moreover, that the individual defendants are shielded from suit by qualified immunity. In addition, defendants deny that plaintiff had any protected property interest in continued employment that could give rise to a due process claim. They accordingly deny violating 42 U.S.C. § 1983. They do not specifically address plaintiff's claim that they retaliated against him in violation of his rights under the common law. (*Id.,* ¶¶ , 11, 5).

### A. Plaintiff's Appointment and Discharge

On December 3, 1997, the Republican-controlled Board of Freeholders reappointed Mr. Siss, a Republican, to a three-year term as Assistant County Counsel. (*See* Siss Aff., Mar. 16, 1999, ¶¶ 2–3; Pascrell Aff., Exh. A). Control of the Board of Freeholders passed to the Democratic party on January 1, 1998 because of the November 1997 election of defendants Gallagher and Cuccinello. (Siss Aff., Mar. 16, 1999, ¶ 3).

On March 24, 1998, the Board of Freeholders passed resolutions to rescind Mr. Siss' three-year appointment as Assistant County Counsel and to terminate his employment. (*Id.,* ¶ 4; Eagler Aff., ¶ 7; Pascrell Aff., Exhs. E, F). Mr. Siss was provided written notice of the March 24, 1998 Board of Freeholders meeting and advised that the Board was scheduled to vote on the two resolutions. (Eagler Aff., ¶ 8). His attorney submitted a letter objecting to the proposed resolutions and addressed the Board of Freeholders at the meeting. (*Id.,* ¶¶ 9–10; Plaintiff's Br., Exh. C).

### B. The Earlier Freeholders' Meeting

Plaintiff's Open Public Meetings Act claim focuses on an earlier meeting among at least some of the Freeholders and Mr. William Pascrell, the newly-appointed

---

1. The Court notes that defendants' moving papers address a claim for defamation that they apparently also discerned in Count I of the Complaint; but plaintiff's opposition brief clarifies that no such claim is asserted. (Plaintiff's Br. at 32).

County Counsel. On March 6, 1998, Mr. Pascrell asked for Mr. Siss' resignation, telling plaintiff that he had met with the Freeholders and they had no confidence in Mr. Siss' ability to represent them. (Siss Aff., Mar. 16, 1999, ¶ 12). Mr. Siss claims that any such meeting violated the Open Public Meetings Act since Mr. Siss was not given prior notice of it.

### C. Defendants' Reasons for Terminating Plaintiff

Evidence has been submitted, mostly by plaintiff, as to whether plaintiff was terminated because he is a Republican or for other reasons. The Court will not address that issue here, since defendants seek summary judgment based on the argument that they could lawfully terminate plaintiff because of his party affiliation. In support of defendants' argument on that score, Freeholder Eagler explains that the Democratic-controlled Board of Freeholders charged County Counsel Pascrell with assembling a legal team that would assist the Board in achievement of the Board's policy goals, which he describes as, "in particular, the restructuring and modernization of County government." (Eagler Aff., ¶ 11). According to him, the Board terminated Mr. Siss because of "a lack of confidence in Siss' ability to dedicate himself to the achievement of the Board's policy agenda." (*Id.*, ¶ 12).

### D. The Nature of the Position of Assistant County Counsel

#### 1. Plaintiff's Evidence

According to Mr. Siss, the position of Assistant County Counsel is not a policy-making position in which political party affiliation is relevant. As Assistant County Counsel part-time for approximately five years, plaintiff primarily handled Sheriff's Department matters. He maintains, "I did not establish procedures and policies for the Sheriff," but states instead, that after procedures and policies were formulated by the Sheriff and his staff, plaintiff performed the "ministerial function of drafting . . . documents" that incor-

porated them. (Siss Aff., Mar. 12, 1999, ¶ 17). More specifically, plaintiff states:

My work involved Disciplinary Actions; preparation of contracts where required; representing the Sheriff's Office in any disputes with any contractors; . . . preparing competitive bid documents where required[; and] handl[ing] Department of Personnel appeals and hearings which had been referred to the Office of Administrative Law in Newark.

(*Id.*) He insists: "At no time in all the years that I served as Assistant County Counsel was I called upon to make any policy decisions or policy recommendations." (*Id.*) He states: "As Assistant County Counsel, I had no contact with the Freeholders nor was any policy agenda brought to my attention." (Siss Aff., Response to Eagler Aff., Mar. 16, 1999, ¶ 4).

Sheriff Edwin Englehardt, for whom plaintiff worked, states, similarly, that Mr. Siss did not "exercise any policy making functions, nor was he consulted on matters of policy." (Englehardt Aff., ¶ 7). Rather, according to Sheriff Englehardt, Mr. Siss' work "was related to matters such as reviewing contracts, prosecuting disciplinary charges, representing us in Department of Personnel referrals to the Office of Administrative Law and other routine legal matters that arose from time to time." (*Id.*, ¶ 6).

Similarly, Republican Freeholder Walter W. Porter, Jr. states that "Mr. Siss's work did not involve him in politics or policy" and that "[p]arty political affiliation is not relevant to the performance of an Assistant County Counsel's responsibilities." (Porter Aff., ¶¶ 3–4). He notes that when Republicans took control of the Board of Freeholders 12 years ago, they retained the Assistant County Counsels who had been appointed by the preceding Democratic-controlled Board. (*Id.*, ¶ 3).

#### 2. Defendants' Evidence

Defendants contend that the position of Assistant County Counsel is a confidential, policy-making position. With respect to

the duties of Assistant County Counsel, they submit relevant portions of the Passaic County Administrative Code, as revised in December 1991, which was in effect at the time of plaintiff's termination. (*See* Pascrell Aff., Exh. G). In a section titled Labor Relations, the Administrative Code provides:

Labor Counsel or Assistant County counsel ... shall be responsible for:

a. All New Jersey Department of Personnel related hearings concerning contested matters between employees and the employer ... [;]

b. Handl[ing] all litigation arising as a result of disputed labor contracts or sections of contracts ... [; and]

c. Monitor[ing] and enforc[ing] the terms and conditions of employment as outlined in the collective bargaining agreements.

(*Id.*, § 3.14).

In addition, the Administrative Code enumerates the following duties of the Department of Law, to be supervised by the County Counsel:

a. Attend meetings of the Board, and give opinions and rulings on questions of law which may arise at Board meetings;

b. Advise the Board, the Administrator and all County agencies, when requested to do so, with respect to their official responsibilities;

c. Prepare and/or supervise the legal form and sufficiency of all contracts, deeds, correspondence and other documents and all resolutions and actions referred to the Department for preparation and review;

d. Represent the County in all matters of litigation, appeals in the courts, proceedings before any administrative agency and in other appropriate matters, and recommend to the Board settlement of any matter;

e. Maintain records of all actions, suits, proceedings, and matters which relate to the County's interest and report thereon from time to time as the Board may require;

f. Render such advisory opinions as are requested by the Board;

g. Have the authority to settle matters in dispute in an amount not to exceed one thousand dollars ($1,000.00); [and]

h. Attend meetings of the Employees' Retirement System of the County of Passaic and render opinions and rulings as to pertinent questions of law.

(*Id.*, § 18.2).

In addition, defendants submit Mr. Siss' own description of his professional responsibilities in transition and status memoranda he prepared at County Counsel Pascrell's request. (Pascrell Aff., Exhs. B, C). In a February 4, 1998 memorandum, plaintiff stated that his job responsibilities had initially focused on representing the Sheriff's Department in disciplinary matters but had since expanded to include other issues. (*Id.*, Exh. B). For example, he noted that he was working on a contract dispute with the provider of nursing services to the jail and on the solicitation of bids to replace that provider and expand the medical services performed for the jail by outside contractors. (*Id.*) He added: "Other duties include working with the Department on procedures and policies and any special interest issues that affect the jail, Sheriff's Patrol and/or courthouse." (*Id.*)

Mr. Siss' list of the matters he was working on in February and March 1998 consists mostly of employment-related disputes but also includes: "Review of infectious disease policy at jail. Working with Deputy Warden on revising;" "Request for Proposal for medical services at jail;" and "Camp Hope." (*Id.; see also id.*, Exh. C). County Counsel Pascrell explains that Camp Hope is a County-operated children's camp not affiliated with the Sheriff's Office and that Mr. Siss served as attorney to the Board-appointed committee responsible for the Camp's administration. (*Id.*, ¶ 11). He adds that Mr. Siss' employment-related responsibilities included providing "legal counsel to the Sheriff's

Department regarding disciplinary actions, settlements and litigation strategy." (*Id.*)

According to Mr. Pascrell: "The Deputy Counsel and Assistant County Counsels are actively involved in the policy-making process and privy to confidential information." (*Id.*, ¶ 21). He states that, since he took office, each Assistant County Counsel has been assigned to one of four Board of Freeholders committees and one of the Assistant County Counsels has joined him in regularly attending the meetings of the fifth committee. (*Id.*) He explains that these committees "review and develop policy and address confidential employment matters," and generate or discuss almost everything that is placed on the Board of Freeholders' agenda. (*Id.*) In addition, he states, these committees are responsible for review of the County's budget. (*Id.*) According to Mr. Pascrell, members of the Law Department are assigned to these committees "for the purpose of providing legal counsel which may include an evaluation of the legal merits of a proposed policy." (*Id.*) Moreover, he states that the Deputy General Counsel and Assistant County Counsels are "responsible for researching and evaluating various policy matters," such as, in the past year, the County's indemnification and sexual harassment policies. (*Id.*, ¶ 22).

In addition, Mr. Pascrell states: "There exists an attorney-client privilege between the Board, County department heads and members of the Department of Law." (*Id.*, ¶ 23). He says that members of the Department of Law have met in closed session with the Board to answer legal questions. (*Id.*) In litigation on behalf of the County, he says, Assistant County Counsels handle day-to-day matters and are relied on by himself and the Board "to provide[ ] their professional evaluation of the matters based on their knowledge of the facts and the applicable law." (*Id.*) According to Mr. Pascrell: "Members of the Department of Law have also represented the County in collective bargaining negotiations." (*Id.*) He further states that there is an attorney-client privilege between the Camp Hope committee and the

Assistant County Counsel assigned to it. (*Id.*)

Moreover, Mr. Pascrell notes that "persons holding the position of Assistant County Counsel, if designated could perform the functions of the County Counsel and Deputy County Counsel if both were absent or incapacitated." (*Id.*, ¶ 20). When Mr. Pascrell took office, the Department of Law retained three Assistant County Counsels, one full-time and two part-time. (*Id.*, ¶ 6).

Finally, defendants submit a Request for Admissions that they served on Mr. Siss on February 5, 1999, and a certification to the effect that plaintiff did not respond within the time period set forth in Fed.R.Civ.P. 36. (Gallagher Cert., Exh. A, ¶ 2). Under Rule 36, the matters included in the Request for Admissions are therefore deemed admitted. Plaintiff accordingly is deemed to have admitted that during the course of his employment as an Assistant County Counsel: he "worked on revising the infectious disease policy at the County Jail;" "represented the Sheriff's Department in contested matters between the Sheriff's Department and its employees;" "provided legal counsel to the Sheriff's Department regarding disciplinary actions, settlements and litigation strategy;" "w[as] privy to confidential information;" "reviewed confidential documents;" "participated in the development of County policy;" "evaluated the legal merits of proposed or existing County policy(ies);" "drafted and/or reviewed documents which were protected by the attorney-client privilege and/or attorney work-product doctrine;" "provided legal advice regarding County policy;" "provided legal advice regarding employment issues;" "provided legal advice regarding litigated or contested matters;" "participated in discussions and/or meetings where County policy was discussed;" "acted as an advisor to policymakers including but not limited to Sheriff Englehardt;" "conducted legal research;" "had access to confidential documents;" "drafted or assisted in drafting contracts;"

"negotiated or assisted in the negotiation of contracts;" "provided legal advice regarding contracts;" "drafted resolutions;" and "provided Sheriff Englehardt and[/]or his subordinates with legal opinions regarding departmental policy." (*Id.*, Exh. A). In addition, plaintiff is deemed to have admitted that he had attorney-client relationships with the County of Passaic, the Board of Freeholders, and the Sheriff's Department. (*Id.*) Finally, plaintiff is deemed to have admitted that he "attended closed sessions of the Board of Chosen Freeholders" and that "[t]he Passaic County Board of Chosen Freeholders has the right to receive the complete cooperation and loyalty of a trusted legal advisor." (*Id.*)

### E. Outstanding Discovery

The Court notes that plaintiff argues in his brief and at oral argument, but not in an affidavit, that defendants' summary judgment motion should be denied so that additional discovery can be conducted. On January 22, 1999, plaintiff served notices of deposition on County Counsel Pascrell and Freeholders Eagler and Cuccinello. (Plaintiff's Br., Exh. A). Defendants responded with a letter refusing to schedule depositions until the Court addresses the threshold immunity issues raised in this summary judgment motion. (*See id.*, Exh. B). Plaintiff argues that the depositions are necessary to shed light on the meeting Mr. Pascrell held with the Democratic Freeholders to which he referred in his discussions with plaintiff on March 6, 1998 when asking for plaintiff's resignation. (*Id.* at 30–31).

### ANALYSIS

### I. Standard

#### A. Rule 56

Federal Rules of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving par-

ty is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.) (*en banc*), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). In deciding a motion for summary judgment, a court must view the facts in the light most favorable to the nonmoving party and must resolve any reasonable doubt as to the existence of a genuine issue of fact against the moving party. *Continental Ins. Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982). The moving party has the burden of establishing that there exists no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Supreme Court has stated that, in applying the criteria for granting summary judgment to a defendant:

> The judge must ask ... not whether ... the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict....

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if it will affect the outcome of a lawsuit under the applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. (*See id.*)

In order to survive a motion for summary judgment, a plaintiff must present "more than a mere scintilla of evidence" in his favor. He "cannot simply reallege factually unsupported allegations contained in his pleadings." (*Anderson v. Liberty Lobby*, 477 U.S. at 249, 253, 106 S.Ct. 2505; *see also Maguire v. Hughes Aircraft*

*Corp.*, 912 F.2d 67, 72 (3d Cir.1990)). Only evidence that would be admissible at trial may be used to test a summary judgment motion; evidence with a deficient foundation must be excluded from consideration. *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 465–66 n. 12 (3d Cir.1989); *see also Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs,* 982 F.2d 884, 890–92 (3d Cir.1992).

### B.   Rule 56(f)

If the party opposing a motion for summary judgment requires additional discovery to justify its opposition, the Court may deny or continue a motion for summary judgment under Fed.R.Civ.P. 56(f). Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

In determining whether to grant relief under Rule 56(f), a district court must consider the information sought and its availability to the party seeking to take advantage of the rule. The United States Court of Appeals for the Third Circuit explained in *Contractors Assoc. of Eastern Pennsylvania v. City of Philadelphia*, 945 F.2d 1260 (3d Cir.1991):

> If information concerning the facts to be discovered is solely in the possession of the movant ... "a motion for continuance of a motion for summary judgment for purposes of discovery should ... ordinarily be granted almost as a matter of course." *Ward v. United States,* 471 F.2d 667, 670 (3d Cir.1973) (citations omitted). The *Ward* rational would not seem to apply, however, when the party seeking discovery has the information it

seeks in its own possession or can get it from a source other than the movant. (*Id.* at 1263).

The Third Circuit has further elaborated:

> [W]hether a Rule 56(f) motion should be granted "depends, in part, on 'what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not been previously obtained.'" ... A district court has discretion in acting on Rule 56(f) motions.... However, where relevant information sought is in the hands of the moving party, "a district court should grant a Rule 56(f) motion almost as a matter of course unless the information is otherwise available to the non-movant."

*San Filippo v. Bongiovanni,* 30 F.3d 424, 432–33 (3d Cir.1994), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995) (quoting *Contractors Assoc. v. City of Philadelphia,* 945 F.2d at 1266–67 (other citations omitted)).

Rule 56(f) specifically requires the filing of an affidavit, not just a brief, explaining the reasons for the requested delay. *See Pastore v. Bell Telephone Co. of Pennsylvania,* 24 F.3d 508, 511 (3d Cir.1994). "The purpose of the affidavit is to ensure that the nonmoving party is invoking the protection of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition. An unsworn memorandum opposing a party's motion for summary judgment is not an affidavit." (*Id.*) (citations omitted). Nonetheless, "failure to support a Rule 56(f) motion by affidavit is not automatically fatal to its consideration." *St. Surin v. Virgin Islands Daily News, Inc.,* 21 F.3d 1309, 1314 (3d Cir. 1994); *see also DeJoy v. Comcast Cable Communications,* 968 F.Supp. 963, 994 (D.N.J.1997). "If a Rule 56(f) motion does not meet the affidavit requirement, it must still 'identify with specificity "what particular information is sought; how, if uncovered, it would preclude summary

judgment; and why it has not previously been obtained.'"'" *St. Surin,* 21 F.3d at 1314 (citations omitted).

## II. Application

Defendants' motion for summary judgment will be granted. The Court will address each of plaintiff's claims in turn.

### A. Violation of the Open Public Meetings Act

■ New Jersey's Open Public Meetings Act, N.J.S.A. 10:4–1 *et seq.* provides that meetings of public bodies should generally be open to the public. However, it allows public bodies to exclude the public from any portions of a meeting at which they discuss "[a]ny matter involving the ... termination of employment ... of any ... employee employed or appointed by the public body, unless all the individual employees or appointees whose rights could be adversely affected request in writing that such matter or matters be discussed at a public meeting." N.J.S.A. 10:4–12(b)(8). New Jersey courts have interpreted this provision to require that employees be afforded "reasonable notice of the intention of [a public body] to consider personnel matters related to them." *See Rice v. Union County Regional High School Board of Education,* 155 N.J.Super. 64, 74, 382 A.2d 386 (App.Div.1977), *certif. denied,* 76 N.J. 238, 386 A.2d 863 (1978); *Oliveri v. Carlstadt–East Rutherford Regional Board of Education,* 160 N.J.Super. 131, 133–34, 388 A.2d 1324 (App.Div.1978). As the Superior Court, Appellate Division explained in *Rice,* employees can only exercise their statutory right to request a public hearing "if they have reasonable advance notice so as to enable them to (1) make a decision on whether they desire a public discussion and (2) prepare and present an appropriate request in writing." *Rice,* 155 N.J.Super. at 73, 382 A.2d 386.

On March 6, 1998, asking for plaintiff's resignation, Mr. Pascrell told plaintiff that he had met with the Freeholders and they had no confidence in Mr. Siss' ability to represent them. (Siss Aff., Mar. 16, 1999, ¶ 12). Plaintiff charges that the meeting between Mr. Pascrell and the Freeholders violated N.J.S.A. 10:4–12(b)(8), as they did not provide him with advance notice. In addition, Mr. Siss seeks additional discovery from Mr. Pascrell and defendants Eagler and Cuccinello to determine exactly what took place at the meeting.

■ Based on the evidence in the record, the meeting does appear to have violated N.J.S.A. 10:4–12(b)(8) as plaintiff had no advance notice of it. However, the Court agrees with defendants that any such violation was remedied by the Board of Freeholders' adequate notice to plaintiff of the March 24, 1999 meeting at which they voted to rescind the resolution appointing him and to terminate his employment. In addition, the Court concludes that the discovery sought by plaintiff would not reveal information that would preclude summary judgment. *See San Filippo,* 30 F.3d at 432–33. Thus, no delay in the adjudication of this motion would be warranted under Fed.R.Civ.P. 56(f), even if plaintiff had submitted the required affidavit in support of his Rule 56(f) application.[2]

Assuming that the meeting between Mr. Pascrell and the Freeholders violated the Open Public Meetings Act and regardless of what precisely took place there, the Court concludes that any violation of N.J.S.A. 10:4–12(b)(8) was remedied by the Freeholders' handling of the public meet-

---

**2.** The Court agrees with defendants that if, as here, a defendant pleads the defense of qualified immunity, "the district court should resolve that threshold question before permitting discovery." *See Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); (*see* Defendants' Answer and Affirmative Defenses, Nineteenth Affirmative Defense). However, defendants argue that qualified immunity shields them from liability for violating plaintiff's First Amendment rights, and plaintiff's argument regarding the need for additional discovery relates to his statutory claim for violation of the Open Public Meetings Act. Thus, the Court does not consider the qualified immunity defense to be a reason for denying plaintiff's Rule 56(f) application.

ing on March 24, 1998. N.J.S.A. 10:4–15 establishes that actions taken in violation of the Open Public Meetings Act are voidable "provided, however, that a public body may take corrective or remedial action by acting de novo at a public meeting held in conformity with this act and other applicable law . . . ." (*Id.*) The Board of Freeholders acted *de novo* and in conformance with N.J.S.A. 10:4–12(b)(8) when it afforded plaintiff notice and then took up plaintiff's termination at the March 24, 1998 public meeting. There is no dispute that plaintiff received advance notice of the March 24, 1998 meeting. The Court concludes that the notice was reasonable, as it allowed plaintiff the opportunity to respond through his attorney both in writing and orally. (*See* Siss Aff., Mar. 16, 1999, ¶ 4: Eagler Aff., ¶¶ 7–10; Pascrell Aff., Exhs. E, F; Plaintiff's Br., Exh. C). Therefore, any action taken at the earlier meeting is not voidable under N.J.S.A. 10:4–15. *See Oliveri*, 160 N.J.Super. at 135–36, 388 A.2d 1324 (assuming school board resolution not to renew contracts violated Open Public Meetings Act because of lack of notice to affected employees, invalidity cured by adequate notice and opportunity to request public discussion at subsequent meeting.) In addition, the Court determines that no information obtained through the depositions of Mr. Pascrell or defendants Eagler or Cuccinello would change this analysis. The Court will therefore grant summary judgment to defendants on this claim.

Furthermore, the Court agrees with defendants that plaintiff's Open Public Meetings Act claim is time-barred. N.J.S.A 10:4–15 provides that actions taken in violation of the statute are "voidable in a proceeding in lieu of prerogative writ in the Superior Court, which proceeding may be brought by any person within 45 days after the action sought to be voided has been made public," subject to the conditions discussed above regarding the public body's ability to cure past violations through a *de novo* consideration. (*Id.*) The Court agrees with defendant that any action taken at the meeting between the Freeholders and Mr. Pascrell was "made

public" on March 7, 1998 when Mr. Pascrell told plaintiff of the sentiments expressed at the meeting and asked for his resignation. Accordingly, plaintiff had 45 days from March 6, 1998 to file his action in lieu of prerogative writ in the Superior Court. He did not file his Complaint until April 27, 1998. For that reason as well, the Court will grant defendants summary judgment as to the Open Public Meetings Act claim.

### B. Violation of the NJLAD

The Court will also grant summary judgment to defendants as to plaintiff's NJLAD claim. As defendants note, and plaintiff does not contest, the NJLAD prohibits employers from discriminating in employment on numerous bases, but these do not include political affiliation. *See* N.J.S.A. 10:5–12(a) (prohibiting discrimination in employment based on race, creed, color, national origin ancestry, age, marital status, affectional or sexual orientation, genetic information, sex, atypical hereditary cellular or blood trait, liability for service in the United States military, nationality, and refusal to submit to a genetic test or make available the results of a genetic test to an employer); N.J.S.A. 10:5–4.1 (prohibiting discrimination in employment on the basis of handicap). Accordingly, plaintiff's claim is not cognizable under the statute. The Court will grant defendants' motion for summary judgment as to plaintiff's NJLAD claim.

### C. Infringement of Rights to Free Speech and Association Under the First and Fourteenth Amendments to the United States Constitution.

The Court will also grant summary judgment to defendants as to plaintiff's claim that they violated his rights to free speech and association under the first and fourteenth amendments to the United States Constitution. The Court understands this claim to be asserted under the federal Civil Rights Act, 42 U.S.C. § 1983. There is no dispute that defendants acted

"under color of" state law. 42 U.S.C. § 1983. The question is thus whether they deprived plaintiff of "any rights, privileges, or immunities secured by the Constitution and laws." (*Id.*) Plaintiff claims that defendants violated his rights under the First Amendment to the United States Constitution, made applicable to the states by the fourteenth amendment to the United States Constitution. The Court determines that no genuine issues of material fact preclude granting summary judgment on that claim.

In *Elrod v. Burns* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the United States Supreme Court established that the first amendment prohibits government officials from terminating public employees simply because they are not supporters of the party in power, except when political party affiliation is an appropriate requirement for the position at issue. *See Rutan v. Republican Party of Illinois*, 497 U.S. 62, 64, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). The plurality explained in *Elrod*: "[P]atronage dismissals severely restrict political belief and association." 427 U.S. at 372, 96 S.Ct. 2673. Thus, the Court determined that they are permissible only in the cases of policy making or confidential positions. (*Id.* at 367–68, 96 S.Ct. 2673; *see also* 427 U.S. at 375, 96 S.Ct. 2673 (Stewart, J. concurring)).

In *Branti*, the Supreme Court refined its analysis, explaining: "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. 1287. *See generally, Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 394–95 (3d Cir.1998); *Wetzel v. Tucker*, 139 F.3d 380, 383 (3d Cir.1998).

*Elrod, Branti* and their progeny require courts to consider various factors in evaluating whether a public employee may be dismissed based on political affiliation. As articulated by the Court of Appeals for this Circuit, these include:

> whether an employee is a "nonpolicy-making, nonconfidential government employee," ... whether a difference in party affiliation would be "highly likely to cause an official to be ineffective in carrying out" the duties of the position, ... whether "the employee has meaningful input into the decision making concerning the nature and scope of a major ... program," ... or whether the employee "acts as an advisor or formulates plans for the implementation of broad goals."

*Boyle*, 139 F.3d at 396–97 (citations omitted). Courts must look to " 'the function of the public office in question and not the actual past duties of the particular employee involved,' " although "evidence of past job duties may in some cases be informative." *Wetzel*, 139 F.3d at 384 (citations omitted).

The Court of Appeals for the Third Circuit has on three occasions considered whether a publicly-employed attorney could be dismissed based on party affiliation. *See Ness v. Marshall*, 660 F.2d 517 (3d Cir.1981); *Mummau v. Ranck*, 687 F.2d 9 (1982); *Wetzel*, 139 F.3d at 380. In each case, the Court of Appeals concluded that the dismissal of the attorney(s) in question did not violate the first amendment under the *Elrod/Branti* line of cases. *See Ness*, 660 F.2d at 517; *Mummau*, 687 F.2d at 9; *Wetzel*, 139 F.3d at 380.

In *Ness v. Marshall*, 660 F.2d at 517, the Court of Appeals held as a matter of law that the positions of city solicitor, assistant city solicitor and second assistant city solicitor were ones for which party affiliation was an appropriate requirement and that, accordingly, the mayor's dismissal of attorneys in those positions based on their political affiliations did not infringe their first amendment rights. (*Id.* at 522–23). As defined under the relevant administrative code, the duties of the city solicitor included: controlling city law matters, representing the city in legal actions

brought against it, and rendering legal opinions to the council, mayor, department heads, administrative boards and other city officials on questions of law, as requested. The Court of Appeals concluded: "[A]s a matter of law, the duties imposed on city solicitors by the ... Administrative Code and the undisputed functions entailed by these duties, e.g., rendering legal opinions, drafting ordinances, negotiating contracts, define a position for which party affiliation is an appropriate requirement." (*Id.* at 522). It emphasized: "In relying on an attorney to perform these functions so intimately related to city policy, the mayor has the right to receive the complete cooperation and loyalty of a trusted adviser, and should not be expected to settle for less." (*Id.*)

The Court of Appeals was unpersuaded by the plaintiffs' evidence that their past responsibilities had been ministerial or technical in nature. (*Id.* at 521). It explained that although the plaintiffs' role might have been limited under the former administration, the administrative code permitted future administrations to rely on them "for the legal advice necessary to implement policy." (*Id.* at 522). Similarly, with respect to the second assistant solicitor, whose duties had been highly constricted under the former administration, the Court of Appeals noted that future administrations could choose to distribute assignments "in an entirely different fashion" so as to rely more extensively on employees in that position. (*Id.*)

Later, in *Mummau v. Ranck,* 687 F.2d at 9, the Court of Appeals held, "essentially for the reasons set forth in *Ness,*" that an assistant district attorney could be terminated based on his political affiliation. (*Id.* at 10). Once again, the Court of Appeals rejected the argument that the plaintiff's duties were purely technical and ministerial, holding it irrelevant that an assistant district attorney "could conceivably operate in such a legal/technical manner" or that the plaintiff had in fact limited himself to such a role. (*Id.,* quoting *Ness,* 660 F.2d at 521).

Finally, in *Wetzel v. Tucker,* 139 F.3d at 380, the Court of Appeals held that a county hospital and education authority's termination of its solicitor did not violate the solicitor's first amendment rights. First, determining that the authority itself was a policy-making body, the Court of Appeals concluded that there was no material difference between its solicitor's role and roles of the attorneys in *Ness* and *Mummau.* (*Id.* at 385). The Court of Appeals noted, for example, that the authority might want to pursue an affirmative action program or consider a bond funding application for a private drug rehabilitation clinic, knowing that these might be challenged on legal or other grounds. It reasoned: "The advice of counsel as to the legality of these actions, and whether or not it was worthwhile to defend them in litigation should that become necessary, would inform these policy decisions in a very direct way." (*Id.* at 386).

Once again, the Court of Appeals rejected the argument that the plaintiff's role was confined to the technical or ministerial function of providing objective legal advice:

> Tough legal questions are not answered mechanically, but rather by the exercise of seasoned judgment. Judgment is informed by experience and perspective, and any evaluation of the risks involved in such a decision (including the determination as to whether it is advisable to pursue litigation) is informed, in turn, by values. Moreover ... these issues are not purely legal; clients employ counsel to assess whether the goals are indeed worth the risks.

(*Id.* at 386). "[T]o be confident in its Solicitor's advice on matters 'intimately related' to Authority policy," the Court explained, "the Board must have the right to demand that his loyalties lie with it and its agenda.... Given the political ramifications of any attendant legal advice, confidence sometimes may come only with the assurance that the Solicitor shares the same political ideology as the Board."

(*Id.*), quoting *Ness*, 660 F.2d at 522). The Court of Appeals concluded: "These situations are exactly the types for which the Supreme Court created the *Elrod/Branti* exception." (*Id.; see also, Battaglia v. Union County Welfare Board*, 88 N.J. 48, 438 A.2d 530 (1981), *cert. denied*, 456 U.S. 965, 102 S.Ct. 2045, 72 L.Ed.2d 490 (1982) (holding termination of legal assistant to county welfare board based on political party affiliation was permissible under first amendment to the United States Constitution.)

The position of assistant county counsel is not materially different from the positions at issue in *Ness*, *Mummau* and *Wetzel*. Under the Passaic County Administrative Code, the duties of the Department of Law, and accordingly of assistant county counsel, include, *inter alia:* "[a]ttending meetings of the Board and giv[ing] opinions and rulings on questions of law which may arise at Board meetings;" "[a]dvis[ing] the Board, the Administrator and all County agencies ... with respect to their official responsibilities;" "[p]reparing and/or supervis[ing] the legal form and sufficiency of all contracts ... and all resolutions and actions referred to the Department;" "[r]epresent[ing] the County in all ... litigation" and other proceedings and "recommend[ing] to the Board settlement of any matter;" reporting to the Board on the status of litigation and other proceedings related to its interests; and "[r]ender[ing] such advisory opinions as are requested by the Board." (Pascrell Aff., Exh. G, Passaic County Administrative Code, § 18.2).

These functions are as "intimately related" to policy as those associated with the positions at issue in *Ness*, *Mummau*, and *Wetzel*. *Ness*, 660 F.2d at 522. In fact, they are largely the same as those of city solicitor discussed in *Ness*, where the Court of Appeals concluded that "the duties imposed ... by the ... Administrative Code and the undisputed functions entailed by these duties e.g. rendering legal opinions, drafting ordinances, negotiating contracts define a position for which party affiliation is an appropriate requirement." (*Id.*)

Plaintiff argues that his own role as Assistant County Counsel was limited to the sort of technical and ministerial responsibilities that the plaintiffs in *Ness*, *Mummau*, and *Wetzel* also claimed they performed. As the Court of Appeals emphasized in all of those cases, the proper analysis focuses on the responsibilities of the position in question, regardless of whether one in that position could conceivably operate in a limited or technical manner, or whether the plaintiff actually did so under a previous administration. *See Ness*, 660 F.2d at 521; *Mummau*, 687 F.2d at 10; *Wetzel*, 139 F.3d at 385–86.

In addition, as the Court of Appeals explained in *Ness*, "courts must appreciate that future administrations may choose to allocate tasks so as to rely more extensively on employees whose positions had previously carried limited responsibilities." *Ness*, 660 F.2d at 522. Indeed, Mr. Purcell's affidavit demonstrates that the position of Assistant County Counsel now carries significant policy-related responsibilities, such as working with Board of Freeholders committees, that may not have been associated with the position during plaintiff's tenure. (*But see* Gallagher Cert., Exh. A, Requests for Admissions (admitting that plaintiff "participated in the development of County policy," "evaluated the legal merits of proposed or existing County policy(ies)," "provided legal advice regarding County policy;" "drafted resolutions," and "attended closed sessions of the Board of Chosen Freeholders")).

Even during plaintiff's tenure, the responsibilities of his position had policy ramifications of the sort explored in *Wetzel*. For example, plaintiff wrote in a memorandum that his "duties include[d] working with the Department on procedures and policies and any special interest issues that affect the jail, Sheriff's Patrol and/or courthouse." (Pascrell Aff., Exh. B). In addition, he recorded time spent

on: "Review of infectious disease policy at jail. Working with Deputy Warden on revising;" "Request for Proposal for medical services at jail" and "Camp Hope." (*Id.*; *see also id.*, Exh. C). Rendering legal advice on such issues, and evaluating the risks involved, calls for the "exercise of seasoned judgment ... informed by experience and perspective ... [and] in turn, by values," that the Court of Appeals discussed in *Wetzel* with respect to the examples of an affirmative action program or a drug rehabilitation center. 139 F.3d at 386. In accordance with *Wetzel,* to be confident in the Assistant County Counsel's advice, the Board of Freeholders had "the right to demand that his loyalties l[ay] with it and its agenda." (*Id.*)

Plaintiff calls to the Court's attention the case of *Pillsbury v. Board of Chosen Freeholders of County of Monmouth,* 133 N.J.Super. 526, 337 A.2d 632 (Law Div. 1975), *aff'd,* 140 N.J.Super. 410, 356 A.2d 424 (App.Div.1976), which held, outside the first amendment context, that political affiliation is not an appropriate qualification for the position of county counsel. While not irrelevant, that opinion ultimately does not change the Court's analysis of the propriety of using political affiliation as a criterion for the position of assistant county counsel.

In *Pillsbury,* the court relied heavily on a statutory provision requiring that "[i]n every county the board of chosen freeholders shall appoint a county counsel," and further mandating that "[t]he term of office of the county counsel shall be 3 years." *See* N.J.S.A. 40A:9–43. It concluded that the statutory provision evidenced the legislature's intent that "the county counsel's term should continue notwithstanding political changes." 133 N.J.Super. at 540, 337 A.2d 632. In addition, the court relied on a statutory provision relating to county officers and employees who are "removable ... only for cause," which provides: "No officer or employee shall be removed from his office or position for political reasons." N.J.S.A. 40A:9–25.

In contrast, the position of assistant county counsel is not statutorily required and its term is not statutorily mandated. Rather, a Board of Freeholders appoints an assistant county counsel at its discretion pursuant to a statutory provision which states:

In addition to the officers and employees whose appointment is specifically provided for by law, the board of chosen freeholders of the county ... may appoint or provide for the appointment of such other officers, agents and employees as may be required for the execution of the powers conferred upon said board ... or any board or officer of the county....

N.J.S.A. 40A:9–9. Thus, there is no statutory provision evidencing any legislative intent that assistant county counsels remain in office notwithstanding political changes.

In addition, as will be discussed further below, assistant county counsels are not employees who are "removable ... only for cause." N.J.S.A. 40A:9–25. Thus, they are not statutorily protected from being discharged "for political reasons." (*Id.*)

The duties of county counsel, like those of assistant county counsels, are fundamentally indistinguishable from the duties of the attorneys in *Ness, Mummau* and *Wetzel.* Under *Pillsbury,* the Court would hesitate, however, to determine that political affiliation is an appropriate qualification for the position of county counsel, despite these Third Circuit precedents. Although *Pillsbury* was decided outside the first amendment context, it is an explication of the nature of that position, which is the fundamental issue in *Elrod/Branti* analysis.

Still, the rationale of *Pillsbury* does not extend to the distinct position of assistant county counsel. There is no evidence that the legislature intended assistant county counsels to serve despite political changes, and they are not statutorily protected from being terminated for political reasons. Thus, the Court concludes, consistent with

*Pillsbury* and the *Elrod/Branti* line of cases, that while political affiliation may not be an appropriate requirement for the position of county counsel, it is an appropriate requirement for the assistant county counsel position at issue here. It would be inconsistent with *Ness, Mummau* and *Wetzel* to hold otherwise.

Finally, the Court rejects plaintiff's argument that the *Elrod/Branti* exception does not apply here because plaintiff was a fixed term, rather than an at-will employee. (*See* Plaintiff's Br. at 34–39). Whether an employee serves for a fixed term or at will, the employee has the same first amendment rights, since those, of course, exist independently of any other rights to continued employment. *See Wetzel,* 139 F.3d at 383 n. 1 (agreeing with district court that plaintiff's status as an at-will employee was irrelevant to his first amendment claim); *Zold v. Township of Mantua,* 935 F.2d 633, 639–40 (3d Cir. 1991) ("The prohibition on political firings from *Elrod* and its progeny is a constitutional requirement independent of state law.") Moreover, as the Court will discuss further below, plaintiff was an at-will employee in any event.

In summary, the Court concludes that "party affiliation is an appropriate requirement for the effective performance of the public office" of assistant county counsel for Passaic County. *Branti,* 445 U.S. at 518, 100 S.Ct. 1287. Accordingly, it grants summary judgment to defendants as to plaintiff's claim for infringement of his rights under the first and fourteenth amendments to the United States Constitution.[3]

### D. Infringement of Rights to Free Speech and Association Under the New Jersey Constitution

The Court also grants defendants' motion for summary judgment as to plaintiff's claim under the New Jersey Constitution. Plaintiff contends that defendants infringed his rights under the State Constitution by terminating him because of his political affiliation. According to defendants, unlike the United States Constitution, the New Jersey Constitution offers no protection against patronage dismissals. Plaintiff does not advance any argument to the contrary.

It is true, as defendants suggest, that constitutional challenges to patronage dismissals in the New Jersey courts have generally proceeded under the first amendment of the United States Constitution, rather than the free speech provision of the New Jersey Constitution, found at article 1, paragraph 6.[4] *See, e.g., Battaglia,* 88 N.J. at 48, 438 A.2d 530; *Morgan v. Union County Board of Chosen Freeholders,* 268 N.J.Super. 337, 633 A.2d 985 (App. Div.1993), *certif. denied,* 135 N.J. 468, 640 A.2d 850 (1994). However, this Court observed relatively recently: "[T]here is no authority for the proposition that the protections of speech under the New Jersey Constitution are any different from those established by the First Amendment." *McCusker v. City of Atlantic City,* 959 F.Supp. 669, 675 (D.N.J.1996). In addition, in *Weisel v. Hooks,* 277 N.J.Super. 78, 648 A.2d 1166 (Ch.Div.1994), the Superior Court analyzed federal and state constitutional claims arising out of a patronage dismissal, applying the same body of federal case law to both.[5]

---

**3.** Since this claim is dismissed as to all defendants, the Court need not address defendants' argument that the individual defendants are shielded from liability by their qualified immunity from suit. In accordance with the analysis above, however, even if the individual defendants had violated plaintiff's first amendment rights, any such rights were not "clearly established," and those defendants accordingly are immune from suit. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

**4.** Article 1, paragraph 6 of the New Jersey Constitution provides in relevant part: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." (*Id.*)

**5.** *Weisel* appears to have rested on a mistaken interpretation of *Battaglia v. County Welfare Board,* a New Jersey Supreme Court case decided exclusively under federal law, which the *Weisel* court suggested had imported fed-

■ At any rate, the Court concludes that if the New Jersey Constitution does protect public employees against patronage dismissals, its protections are no greater than those under the first amendment to the United States Constitution. *See McCusker v. City of Atlantic City*, 959 F.Supp. at 675; *Weisel v. Hooks*, 277 N.J.Super. at 78, 648 A.2d 1166. The Court will therefore grant to defendants summary judgment as to plaintiff's claim under the New Jersey Constitution for the reasons articulated with respect to his federal first amendment claim.

### E. Denial of Due Process Rights Under the Fourteenth Amendment to the United States Constitution

The Court will also grant summary judgment to defendants on plaintiff's claim that they denied him due process by failing to "serve him with charges and provide a hearing." (Compl., ¶ 4). Again using the 42 U.S.C. § 1983 analysis, there can be no dispute that defendants acted "under color of" state law. (*Id.*) The question therefore is whether they deprived plaintiff of "rights, privileges, or immunities secured by the Constitution and laws," in this case, the due process rights guaranteed by the fourteenth amendment. (*Id.*)

In support of their motion for summary judgment on that claim, defendants argue that plaintiff did not have a protected property interest in his position because he was an at-will employee. (*See* Defendants' Br. at 9–10 n. 2). The Court agrees.[6]

■ The Due Process Clause of the fourteenth amendment mandates that no "State shall deprive any person of, life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. At-will employees do not have protected property interests in their positions within the meaning of the fourteenth amendment. *See Robertson v. Fiore*, 62 F.3d 596, 601 (3d Cir.1995). Whether an employee has a

protected property interest in retaining a given government job is determined by state law. *See Brown v. Trench*, 787 F.2d 167, 170 (3d Cir.1986).

■ Under New Jersey law, public employees may be discharged with or without cause, unless their positions are otherwise protected, for example, by contract, collective bargaining agreement, civil service tenure, or a fixed term. *See Nicoletta v. North Jersey District Water Supply Commission*, 77 N.J. 145, 150–54, 390 A.2d 90 (1978). Plaintiff seems to maintain that he had a property interest in his position because the Board of Freeholders' December 3, 1997 Resolution appointed him to a three-year term, which had not yet expired on March 24, 1998, when it passed the resolutions rescinding his appointment and terminating him from his position.

■ The Court is unpersuaded. The power to adopt a statute, ordinance, or resolution generally includes the power to repeal it. *See In re Meadowlands Communications Systems, Inc.*, 175 N.J.Super. 53, 71, 417 A.2d 575 (App.Div.1980), *certif. denied*, 85 N.J. 455, 427 A.2d 556 (1980); *Board of Recreation Commissioners of Borough of Rutherford v. Borough of Rutherford*, 166 N.J.Super. 476, 400 A.2d 95 (App.Div.1979). Thus, in *Greene v. Freeholders of Hudson*, 44 N.J.L. 388, 1882 WL 8528 (Sup.Ct.1882), the New Jersey Supreme Court long ago held that term appointments made by an outgoing Board of Freeholders were subject to review and recision by the successor Board. (*Id.* at 391). As here, the appointments were made pursuant to a general statutory provision giving the Board of Freeholders the discretion to appoint such officers and employees as necessary to perform the county's business. (*Id.* at 390). The Court held that the outgoing Board's one-year appointments were valid, but qualified,

---

eral case law into an analysis of New Jersey constitutional claims. *Compare Weisel*, 277 N.J.Super. at 83–84, 648 A.2d 1166, *with Battaglia*, 88 N.J. at 52, 438 A.2d 530.

6. The Court notes that defendants do not argue that they afforded plaintiff all the process that was due. Therefore, the Court does not consider that question here.

"[I]t does not follow that because of the validity of the resolutions in this regard the title to these offices are assured to the occupants for a year." (*Id.* at 391). It explained:

> The power that created [the terms] can destroy them. The tenure of any officer is held at the will of the Board. He can be stripped of his salary, deposed from office, or be left unsheltered by reason of the abolition of the office itself at any moment the Board chooses to exercise its power.

(*Id.*) (citations omitted).

More recently, in *Campbell v. Atlantic County Board of Freeholders*, 145 N.J.Super. 316, 367 A.2d 912 (Law Div. 1976), *aff'd*, 158 N.J.Super. 14, 385 A.2d 311 (App.Div.1978), the Superior Court, Law Division, expressly held, with the Appellate Division affirming, that a public employee did not have a protected property interest in his position by virtue of a Board of Freeholders resolution appointing him to a defined term. In that case, the Board of Freeholders had passed a resolution appointing the plaintiff to the position of Emergency Employment Administrator, expressly "for the duration of [a particular] project ... and for any replacement, substitution, extensions and renewals thereof." (*Id.* at 322, 367 A.2d 912) (citation omitted). Before the project ended, the Board of Freeholders passed another resolution discharging the plaintiff, without prior notice and a hearing. (*Id.* at 321, 367 A.2d 912). The plaintiff claimed, as Mr. Siss apparently does here, that without due process of law, the defendants had deprived him of his property interest in maintaining his position for the term set forth in the appointing resolution. (*Id.* at 325, 367 A.2d 912).

The court rejected that claim. There, as here, no evidence was presented "to indicate that either plaintiff or defendant attributed any contractual effect to th[e] phrase" regarding the term of his appointment. (*Id.* at 322, 367 A.2d 912). The court determined that the appointing resolution "was not a contract of employment, but an administrative mechanism necessary to formally effectuate the board's action." (*Id.* at 322–23, 367 A.2d 912). Noting that "[a] mere expectancy" receives no due process protection, the court concluded: "Standing alone, the resolution [wa]s insufficient to support a finding that plaintiff held a property interest in his position...." (*Id.* at 325, 367 A.2d 912). The court rejected his fourteenth amendment due process claim, and its decision was ultimately affirmed by the Appellate Division "substantially for the reasons expressed" in the trial court opinion. 158 N.J.Super. at 15, 385 A.2d 311.

Following *Campbell* and the principles set forth in *Greene*, this Court determines that plaintiff did not gain a property interest in his position by virtue of his December 1997 appointment to a three-year term.

Plaintiff's reliance on *Pillsbury v. Board of Chosen Freeholders of County of Monmouth*, 133 N.J.Super. 526, 337 A.2d 632 (Law Div.1975), *aff'd*, 140 N.J.Super. 410, 356 A.2d 424 (App.Div.1976), is again misplaced. That case established that a Board of Freeholders must have just cause to discharge a county counsel before the expiration of his term. 133 N.J.Super. at 531, 337 A.2d 632. Again, however, the court's conclusion was tied to the express statutory requirement that a Board of Freeholders appoint a county counsel and that the county counsel's term be fixed at three years. It provides no support for concluding that the Board of Freeholders must have just cause to terminate as assistant county counsel, whose appointment and term were entirely within its discretion under N.J.S.A. 40A:9–9. Under *Campbell* and *Greene*, plaintiff was an at-will employee, without a property interest in his employment.

The Court finds further support for its conclusion in the Rules of Professional Conduct. The Court agrees with defendants that those rules imposed upon plaintiff the ethical obligation to "withdraw from the representation of a client ... if

... discharged." *See* RPC 1.16(a)(3). The central question in *Pillsbury* was whether the "statutory fixed-term requirement" for county counsels should give way to "the unique attorney-client relationship which traditionally permits the client to discharge his attorney at any time." 133 N.J.Super. at 533, 337 A.2d 632. In particular, the defendants in *Pillsbury* argued that the county counsel had no right to serve out his appointed term under the predecessor provision to RPC 1.16(a)(3), Disciplinary Rule 2–110(B)(4). (*Id.*)

In *Pillsbury*, the court held that the statutory fixed-term requirement was unaffected by DR 1–220(b)(4). This Court determines, however, that that result hinged on the specific legislative creation of the office of county counsel and its term. Under *Pillsbury*, the county counsel's relationship with the Board of Freeholders is not governed by the standard rules regarding attorneys and clients because the county counsel holds a public office whose parameters are defined by the legislature. As the Appellate Division explained in *Pillsbury*:

> The post of county counsel is a public office ... [, a] creature[ ] of the Legislature. The Legislature alone may determine the duties and the interrelation among the public offices it establishes. Within the constitutional framework the Legislature is the architect of the structure of government.... [T]he attorney holding the office is not only involved in the practice of law, but also, because of his status as a public officer, has the duty of carrying on operations of government.... Contrary to the suppositions of the board, the office of county counsel exists for the protection of all of the citizens of the county, and not solely for the benefit of the freeholders elected to govern that county.

140 N.J.Super. 410, at 413–14, 356 A.2d 424 (App.Div.1976).

In contrast, in *Taylor v. Board of Education for the School District of the City of Hoboken*, 187 N.J.Super. 546, 455 A.2d 552 (App.Div.), *certif. denied*, 95 N.J. 228, 470 A.2d 441 (1983), the Appellate Division concluded that an attorney appointed by the school board did not have the right to maintain his position in light of DR 2–110(B)(4). The plaintiff in that case was appointed by the school board under a statutory provision, similar to that in this case, which simply empowered the board to employ "other officers and employees as it shall determine." (*Id.* at 553–54, 455 A.2d 552). Finding that N.J.S.A. 38:16–1 and the disciplinary rule were "in direct conflict," the Appellate Division reasoned: "[I]t would be gross judicial eccentricity to acknowledge the disciplinary rule, the constitutional power of the Supreme Court to enact it and yet hold that the legislative grant of tenure controls." (*Id.* at 559, 455 A.2d 552). The Appellate Division held that the plaintiff's veteran's tenure right gave way to the mandate of DR 2–100(B)(4), and more broadly that N.J.S.A. 38:16–1 "does not govern the attorney-client relationship." (*Id.* at 561, 455 A.2d 552.)

The Appellate Division in *Taylor* did not expressly articulate the distinction between the circumstances before it and those in *Pillsbury*. *See Hiering v. Township of Jackson*, 248 N.J.Super. 37, 43 n. 2, 44, 589 A.2d 1373 (Law Div.1990), *aff'd*, 248 N.J.Super. 9, 589 A.2d 1357 (App.Div. 1991) (arguing that no real factual distinction exists and doubting that *Pillsbury* remains good law). In this Court's view, however, there is a meaningful distinction to be drawn based on the absence in *Taylor* of any statutory protection specifically for an attorney. N.J.S.A. 38:16–1 is a tenure provision of general applicability, whereas the provision at issue in *Pillsbury*, N.J.S.A. 40A:9–43, applies specifically to attorneys, i.e. county counsel.

The Appellate Division seems to have drawn this distinction in *Hiering v. Township of Jackson*, 248 N.J.Super. 9, 589 A.2d 1357 (App.Div.1991), commenting somewhat cryptically:

> To the extent that the *Pillsbury* rationale may be inconsistent with the result

reached in *Taylor*, we regard the latter to be controlling in the sense that it holds that Supreme Court disciplinary rules generally are applicable even to attorneys holding public office in that capacity. However, we have no need to discuss here which might govern if there is any tension between a Legislative provision and a disciplinary rule.

(*Id.* at 10, 589 A.2d 1357).

■ The Court concludes that, under New Jersey law, in the absence of a contrary statutory provision specifically applicable to attorneys, an attorney has no right to retain a position once discharged by a client under RPC 1.16(a)(3). Plaintiff can point to no statutory provision protecting his right to his position, and none specifically applicable to attorneys. Therefore, under RPC 1.16(a)(3), he had no right to retain his position when the Board of Freeholders sought to discharge him. For that reason as well, the Court determines that plaintiff had no protected property interest in maintaining his position within the meaning of the Due Process Clause.

The Court will grant summary judgment to defendant on plaintiff's due process claim. He was an at-will employee of the Board of Freeholders, and he had a further obligation to comply when discharged under RPC 1.16(a)(3).

### F. Retaliation in Violation of Common Law Rights

Defendants do not present any arguments specifically directed to the remaining claim, for retaliation in violation of plaintiff's common law rights. However, the Court will grant summary judgment as to that claim, as well, largely for the reasons outlined above.

■ New Jersey law recognizes a common law claim for wrongful discharge. *See Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980). The Court presumes that this supplies the predicate for plaintiff's claim of retaliation in violation of his common law rights. Under *Pierce*, "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." 84 N.J. at 72, 417 A.2d 505. The sources of public policy include: "the United States and New Jersey Constitutions; federal and state laws and administrative rules, regulations and decisions; the common law and specific judicial decisions; and in certain cases, professional codes of ethics." *See MacDougall v. Weichert*, 144 N.J. 380, 391, 677 A.2d 162 (1996).

■ As the discussion above makes clear, the first amendment to the United States Constitution embodies a general public policy against dismissing public employees for political reasons. *See MacDougall*, 144 N.J. at 424, 677 A.2d 162 (Wilentz, C.J., dissenting) (citing *Rutan v. Republican Party*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), as source of public policy for New Jersey common law wrongful discharge claim). In addition, that policy is expressed in the New Jersey statutes at N.J.S.A. 40A:9–25, which provides, with respect to county officers and employees "removable ... only for cause," "No officer or employee shall be removed from his office or position for political reasons." (*Id.*) The trial and appellate decision in *Pillsbury* further express this same public policy.

However, as discussed above, plaintiff's discharge did not contravene any public policy that can be divined from these sources. The position of assistant county counsel is encompassed by the *Elrod/Branti* exception to the ordinary first amendment bar on patronage dismissals. In addition, plaintiff was an at-will employee of the Board of Freeholders, not a public employee "removable ... only for cause" and therefore statutorily protected from dismissal for political reasons. Since neither plaintiff's appointment nor his term was mandated by statute, *Pillsbury*'s rationale does not apply. Finally, plaintiff's termination was in accord with the public policy embodied in Rule 1.16(a)(3) of the Rules of Professional Conduct, as en-

forced in *Taylor*, 187 N.J.Super. at 546, 455 A.2d 552, which required him to step down when discharged by his client. For the reasons summarized here and discussed at length earlier in this Opinion, plaintiff's termination was not "contrary to a clear mandate of public policy." *Pierce*, 84 N.J. at 72, 417 A.2d 505. Accordingly, the Court also grants summary judgment to defendants on plaintiff's wrongful discharge claim.

## CONCLUSION

For the foregoing reasons, defendant's summary judgment motion is granted.

## ORDER

**ORDERED** that defendants' motion for summary judgment be, and it hereby is, granted, and plaintiff's Complaint is hereby dismissed in its entirety.